IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| DINI, EMIR<br><br>*Plaintiff*<br><br>v.<br><br>STATE OF WISCONSIN,<br>WISCONSIN LEGISLATIVE<br>REFERENCE BUREAU,<br>RICHARD CHAMPAGNE, IN HIS<br>OFFICIAL CAPACITY AND<br>CATHELENE HANAMAN, IN HER<br>OFFICIAL CAPACITY<br>*Defendants* | Case No. 20 CV 087 WMC<br><br>HON. WILLIAM M. CONLEY<br><br>**COMPLAINT**<br>**TRIAL BY JURY DEMANDED** |

## COMPLAINT

The Plaintiff files this complaint and alleges as follows against the Defendants:

### NATURE OF THE ACTION

1. This is an action for declaratory and injunctive relief along with damages against the Defendants. Plaintiff seeks to redress the deprivation of rights under Title VII of the Civil Rights Act, 42 U.S.C §§1981; 1983; 1985 and under the Equal Protections Clause (Amendment XIV).

### THE PARTIES

2. The Plaintiff was an applicant for a vacancy that was filled by the Defendant earlier last year.

3. The Defendant is the Wisconsin Legislative Reference Bureau, an entity created by the State of Wisconsin. Mr. Richard Champagne is the Chief of the Wisconsin Legislative Reference Bureau. Ms. Cathlene Hanaman is the Deputy Chief Legal Counsel of the Wisconsin Legislative Reference Bureau.

4. Both Mr. Champagne and Ms. Hanaman are being sued here in their official capacities.

## JURISDICTION & VENUE

5. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 & 28 U.S.C. § 1343 because this action involves claims arising under the Constitution of the United States.

6. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(1).

7. The Plaintiff has filed with the Equal Employment Opportunity Commission ("EEOC"), a timely charge and has received a right to sue letter from the United States Department of Justice ("DOJ"), after the charge was assigned to them (a true and accurate copy of that right to sue notice letter is attached to this complaint).

8. The Plaintiff is commencing this action within ninety (90) days after receiving his right to sue letter from the United States Department of Justice [**Exhibit 1**].

## FACTUAL BACKGROUND

9. On or around April of 2019, the Wisconsin Legislative Reference Bureau ("LRB") announced a vacancy seeking to fill a role for a "Legislative Research Analyst" (Job ID: 1901096) [**Exhibit 2**]. In order to apply, applicants needed to send a resume, cover letter and a writing sample via email to Ms. Lynn Emery, the HR representative for the LRB.

10. On or around May 3, 2019, the vacancy for the role was closed and the LRB began the process of evaluating the applicants. The Plaintiff was 1 of 75 other applicants who had applied for the position [**Exhibit 3 – pg. 1**]. Those in the applicant pool included lawyers, professors, historians, and public policy analysts.

11. On or around this timeframe, the LRB created a four-person panel to evaluate the applicants. The panel was composed of Deputy Chief Counsel Cathlene Hanaman, Legal Analyst Joseph Kreye, Legislative Analyst Jillian Slaight and Legislative Analyst Madeline Kasper. The panel created a rubric for the evaluation of applicant writing samples that ranged from "A," "B", "C", "D", "E" and "F". The criteria for evaluation was based on, "exceptional organizational skills, ability to present complicated information in an accessible style and clarity" [**Exhibit 3 – pg. 2-3**].

12. Once each applicant was evaluated by the panel, Legislative Analyst Jillian Slaight then further grouped them into an additional five categories. The categories were labeled as, [1] "enthusiastic interviewees", [2] "on the fence because unsure of commitment to non-academic career", [3] "other decent interviewees", [4] "decent but borderline no" and [5] "no". Additionally, Legislative Analyst Madeline Kasper also group the applicants into her own categories which were labeled as [1] "yes", [2] "good", [3] "maybe", [4] "not great" and [5] "no" [**Exhibit 3 – pg. 3**].

13. The Plaintiff was rated as a "D" and placed into the "no" category for both of the schemas used by Kasper and Slaight [**Exhibit 3 – pg. 3-4**].

14. Eventually, the LRB interviewed 8 applicants (Applicants 2, 14, 55, 52, 6, 72, 3, 29). Three were hired, Applicant 72, Applicant 3 and Applicant 29 [**Exhibit 3 – pg. 4**].

15. On or around June 2019, the Plaintiff submitted a records request by email to Ms. Lynn Emery, the HR point-of-contact for the LRB, to obtain the resumes for the hired applicants. The request was handled by Deputy Chief Counsel Cathlene Hanaman. In an email sent to the Plaintiff, Ms. Hanaman declined to provide the sought records, only releasing the names of the new hires, citing an in-applicable law. The Plaintiff insisted on the full disclosure of resumes but Ms. Hanaman

refused to provide any further records [**Exhibit 4**].

16. The Plaintiff evaluated the new hires, using open-source data and found it suspect that Applicant 72 did not meet the stated minimum qualifications. Seeking additional information, the Plaintiff contacted the Wisconsin State Attorney General's Office ("AGO") to request guidance on obtaining the sought records (i.e resumes for the new hires). The Plaintiff spoke with Attorney Anne Bensky who advised the Plaintiff that records of civil servants were public, subject to exceptions in only very few limited circumstances. The Plaintiff consulted the AGO's publication, *"Wisconsin Public Record Laws Compliance Guide"* used by the public but written with government staff in mind, to determine that his request was lawful and should not have been denied [**Exhibit 5**].

17. On or around June of 2019, the Plaintiff submitted an EEOC ("Equal Employment Opportunity Commission") complaint, believing that race, national origin and religion played a role in the hiring process.

18. On or around October of 2019, the Plaintiff sought out additional information about the history of the LRB. The Plaintiff sought to use the informational services of the LRB, which are available to the public, to determine its history of inclusion and diversity. On or around this timeframe, the Plaintiff emailed the Chief of the LRB, Mr. Richard Champagne and a Legislative Librarian, asking, "in its' 118 history, has the legislative reference bureau ever employed minorities?" [**Exhibit 6**].

19. The Plaintiff never received a response nor was his question ever answered.

20. On or around September of 2019, the respondent, through assigned Attorney Anne Bensky, provided a position statement to the EEOC. The position statement contended that the Plaintiff was not considered for employment as a direct result of his writing sample and denied that the LRB discriminated against the Plaintiff. The respondent's position statement further detailed the hiring process and included numerous supplemental attachments detailing the examination process used for hiring [**Exhibit 3**].

21. On or around September of 2019, the EEOC charge was transferred to the

Department of Justice ("DOJ"), Civil Rights Section.

22. On or around November of 2019, the Plaintiff was issued a right-to-sue notice letter by the DOJ [**Exhibit 1**]. Shortly thereafter, the Plaintiff sought to settle the case, in exchange for the Defendant aligning its' HR practices with official state policy. Despite the terms including no monetary relief to the Plaintiff, the Defendant refused to consider the offer. As a result, the Plaintiff now brings this lawsuit as a remedy to his injuries and to end a century long practice by the Defendant that has obstructed and unfairly excluded the recruitment of African-Americans to the highest echelons of state government.

## GENERAL ALLEGATIONS

### 1. STANDARD HIRING PRACTICES FOR THE STATE OF WISCONSIN

23. The State of Wisconsin employs a standardized hiring policy, codified under chapters 111 and 230 of the Wisconsin State Constitution. In particular, Chapter 230 details the manner in which all civil service positions are filled. This chapter establishes the Division of Personnel Management ("DPM"), which oversees, regulates and provides guidance to all other state agencies. The Division of Personnel Management publishes several publications (known collectively as the "Wisconsin Human Resource Handbook"). The handbook ("WHRH") provides guidance, based on language found under Ch. 230 et seq., on a scope of HR issues from vacancy announcements, to establishing recruitment criteria, to conducting assessments all the way to the planning of retirement for state employees.

24. The LRB, as a governmental state agency, is subject to these guidelines. Furthermore, chapter 230 encourages compliance and seeks to create a uniform set of human resource practices that align with the legislative mandates found under this chapter (see 230.01 & 230.02).

25. If the LRB seeks to fill a vacancy, under DPM guidelines, the LRB must follow a set of detailed regulations that governs the creation of qualifying criteria for the position, how the position will be advertised to the public and how the applicants will be evaluated.

26. In creating qualifying criteria, the LRB is required to conduct a job analysis (WHRH, Ch. 176), which takes into account the necessary skills, training, experience and knowledge required to distinguish the most qualified applicants. During the process, the LRB is further required to identify areas of the job content, a delineation of requirements as being 'necessary', 'preferred' or non-consequential to the role being filled. These typically show up as minimum qualifications and/or preferred qualifications in job announcements. One denotes a necessity whilst the other denotes preference.

27. If a qualifying criteria is identified during job analysis as being required, it is used to, "establish minimum qualifications needed...to advance an applicant to subsequent steps in the selection process" (Sec. 176.070). If an applicant does not have the skills being sought, they are rejected under this framework.

28. If a qualifying criteria is identified during job analysis as being preferred, it is, "utilized... in identifying well-qualified applicants and cannot be part of the minimum threshold (passing point) for initial assessments." (176.070). Under this framework, an applicant is still required to meet the minimum qualifications but once they have passed, other aspects (i.e advanced education, training, skills) are evaluated. DPM requires that a "3 or 9 point scale must be utilized when using preferred content in an initial assessment. Pass/Fail scoring is not permitted with preferred content" (176.070).

29. A 3-9 point is provided by the DPM on page 8 of the WHRH, Chapter 176. When utilized, a 9-point scale is required to provide enough detail to define the full range of scores within each of the categories (i.e less than acceptable, acceptable, and more than acceptable).

### 3-point scale (left-side) | 9-point scale (right-side):

0 = no scorable response | 0 = no scorable response
1 = less than acceptable | 1-3 = less than acceptable
2 = acceptable | 4-6 = acceptable
3 = more than acceptable | 7-9 = more than acceptable

30. If a qualifying criteria is determined as non-consequential to the position, it is

not to be used (176.070).

31. Once the criteria is clearly defined for the position, it is finalized and the position is formally announced to the public. Invitations to apply are solicited and applications are accepted through the Wisconsin Jobs Portal.

32. During this process, the security and privacy of applicant data (and the process as a whole) is of paramount importance. "Fair and equal opportunity to compete in an objective selection process depends upon the security of application materials and other materials related to the selection process" (WHRH Ch. 104, p. 8). "All participants involved in filling a classified vacancy are responsible for maintaining the confidentiality and security of materials related to the entire selection process" (WHRH CH. 176, p. 4).

33. Once the vacancy is closed, applicants are reviewed on an initial pass/fail basis to determine if they meet the minimum qualifications. If they pass and if the position requires a review of supplemental materials (i.e writing samples), a panel is created. To evaluate an applicant on such subjective criteria, the DPM recommends using a 9-point scale (176.080(1)(b)).

34. Those selected to serve on a panel must disclose if they can be impartial or if there are any conflicts of interest. To aid this process, the names of applicants are disclosed to panel members. Panel members who are unable to evaluate applicants objectively and impartially are required to withdraw at this time.

35. Once panel members are finalized, agreed upon criteria to evaluate the applicants is established. This criteria must '*provide enough detail to define the full range of scores*' (176.070). All selection criteria must be job-related and valid (as described under Title 29 CFR § 1607 et seq.,), in order to be viable for audit (to test for disparate impact). More, the criteria must provide for an "objective evaluation of an applicant's character, training, experience, skills or abilities as they *relate to* the requirements for the position...[and] no employment recommendation shall be based on political or religious affiliations or on membership in associations not primarily *related to* merit in employment" (230.20 et seq.,).

36. During this process, panel members are not permitted to disclose "the

confidential nature of the process" to others; However, such records are open to the public 'after completion of evaluations' (176.100(2(d)).

37. Upon completion of evaluations by the panel, the selected applicants are contacted for interviews. Those that pass the interviews are then offered an opportunity to accept the role.

## 2. DEVIATION FROM STATE POLICY

38. In soliciting applications for Job ID: 1901096 ("Legislative Research Analyst"), the LRB never utilized the Wisconsin Jobs Portal. Rather, applicants were instructed to directly email Ms. Lynn Emery [**Exhibit 2**].

39. Once an applicant pool was created, no initial screening was applied (pass/fail) to determine if applicants met the minimum requirements for the vacancy. One of the applicants that failed to meet the minimum qualifications was later hired (Applicant 72) [**Exhibit 3 – pg. 4-5**].

40. A 3 or 9 point scale was never used, making the rubric utilized by the LRB un-auditable (for disparate impact). The rubric was composed of 3 sets of differing standards. Hanaman employed an A-to-F approach. Jillian employed a set of five criteria and Kasper employed a gradient (ranging from yes to no). None of these rubrics was defined in sufficient detail, rather it was intuitive and *laissez faire*.

41. Applicant information was not kept secure and panel members breached the privacy of the process by disclosing those under evaluation to co-workers. Ryan LeCloux, a non-panel member, made recommendations to the panel that they hire fellow college and personal acquaintances (Applicants 3 and 4). Zachary Wyatt, another non-panel member, made recommendations to the panel that they hire a similar acquaintance (Applicant 6) [**Exhibit 7**].

42. Those serving on the panel were not objective and had clear conflicts of interest in being impartial evaluators. Ms. Slaight makes notes on applicants that she shared a personal connection with, writing, "this is someone I know and respect a great deal, she is extremely smart, patient, and kind. She would do very well at this job" (Applicant 55). Kasper does the same for applicant 6, writing, "knows ZDW

[Zachary D. Wyatt] and JS [Jillian Slaight] and I have had positive experience with, would jump right in". Similar notes are made for Applicant 7, in which a panel member writes, "I know her peripherally and she seems to have a good head on her shoulders" [**Exhibit 8**]. Under DPM guidelines and state law, Ms.Slaight, Ms.Kasper and others should have recused themselves as panel members.

43. Of the eventual 8 people interviewed, 4 or half (50%) had these "endearing notes" made. One of those applicants (Chris Webb) was eventually hired. Mr. Webb is a graduate of the University of Wisconsin's Robert M. LaFollette college, to which the panel members noted on the comments. Those with such notations had a 100% success rate of being interviewed, despite the fact that state law prohibits public officials from using their positions to assist members of organizations to which they have associations with in securing employment (Code of Ethics, 19.45(2)).

44. Wisconsin law specifically prohibits employment recommendations that are based on, "membership in associations not primarily related to merit in employment [and any criteria must provide for an] "objective evaluation of an applicant's character, training, experience, skills or abilities as they relate to the requirements for the position" (230.20).

45. More, there were inconsistencies when the criteria developed by the panel was applied to the applicants. Applicant 6, whose letter was deemed too long was not disqualified on that basis, as Applicants 7 and 51 were. Applicant 6 had an "endearing note" made and was eventually interviewed [**Exhibit 8**].

46. Applicant 55 was not disqualified for a "questionable writing sample", as Applicants 13 (the Plaintiff), 57, 58, and 70 were. Applicant 55 had an "endearing note" made and was eventually interviewed [**Exhibit 8**].

47. Applicat 3 had a 'so-so' writing sample and was not disqualified as Applicants 13 (the Plaintiff), 57, 58, and 70 were. Applicant 3 had an "endearing note" made and was eventually interviewed. Applicant 3 is now employed with the LRB [**Exhibit 7**] [**Exhibit 8**].

48. Applicant 59 was not disqualified for not having enough experience, as Applicants 1, 2, 9, 11, 13 (the Plaintiff) 17, 28, 34, 37, 43, 48, 50, 66, 67 were

**[Exhibit 7]**, **[Exhibit 8]**.

49. Applicant 72 (Applicant 72), who was rated as "B", was noted as having unrelated experience and was not disqualified on this basis as Applicants 11 ("C"), 19 ("C"), 26 ("C"), 35 ("C"), 47 ("F"), 54 ("B") and 58 ("C") were **[Exhibit 7]**, **[Exhibit 9]**.

50. The descriptors assigned to applicants were also inconsistent, at random, impulsive and not grounded in discernible human resource policy. Applicant 57 and 68 had 'cliches in [their] writing'. Applicant 7 had 'jargony writing'. Applicant 10 was noted for being 'too legaleze'. Applicant 29 had a writing sample that was 'very dry'. Applicant 56 was described as being 'smart but not impressive'. Applicant 5, 9 and 46 were all 'awkward writer[s]'. Applicant 34 had a 'folksy writing style'. Applicant 51 was described as academically 'hideous' **[Exhibit 9]**.

51. While all these applicants are represented by numbers, it is very important to note that these are real people to which such characterizations were made. Given the lack of inhibition, there is no telling what verbal descriptors may have been assigned to applicants during the panel's deliberations.

### 3. CIVIL CONSPIRACY

52. Records of civil servants are open to public examination (103.13; Ch. 19 et seq; *Woznicki v. Erickson*, 549 N.W.2d 699 (Wis. 1996); *Wisconsin Newspress, Inc. v. School Dist. of Sheboygan Falls*, 199 Wis. 2d 769, 546 N.W.2d 143 (1996)), among other cases. In the process of recruitment, materials related to examination by panel members is authorized for public disclosure (176.100(2)(d)). State law does not shield nor is it intended to be used as a veil to hide the improper conduct of government officials.

53. The LRB serves a unique legislative role. Staff at the LRB, including Ms. Hanaman and Mr. Champagne, oversee the drafting, revising and publication of state laws, in partnership with legislators. Those that serve at the LRB have an unparalleled and uniquely special understanding of state law.

54. The denial of the Plaintiff's records request by the Defendants was based on an

in-applicable state law (19.36(10)(a)(c)(d)), to which, the LRB had a hand in researching, drafting, revising, and eventually passing. During the time-frame in which these records were being sought, the Plaintiff had already been making similiar requests to others state agencies, departments and divisions, *all* of whom were subject to the provisions under Chapter 19 (Wisconsin Public Records Act). *All* of them processed the Plaintiffs requests, *all* of them understood that Chapter 19 and supporting case law, required the disclosure of the sought records [**Exhibit 10**], [**Exhibit 11**], [**Exhibit 12**], [**Exhibit 13**], [**Exhibit 14**], [**Exhibit 15**]. The only party that refused to process the Plaintiff's public records request was the LRB. The LRB, Mr. Champagne, Ms. Hanaman et al., were aware that the disclosure of sought records would expose a hiring process marred by cronyism and clearly detached from official state policy. Hence, they conspired to deny the Plaintiff's records request in order to stifle the exercise of his constitutional right to be free from discrimination, by denying the Plaintiff access to crucial information, that would have been material to any civil rights charges made against them.

### 4. EQUAL PROTECTION VIOLATION

55. The LRB is meant to serve the public impartially and equally (Ch. 13). It is to serve as a repository for information which the general public and legislators may find pertinent and of importance to them. On it's website, the LRB states that it, 'answers inquiries from the general public on matters relating to the legislature and state government' [**Exhibit 16 – pg. 2**].

56. The Plaintiff sought to obtain information pertaining to the history of inclusion and diversity at the LRB. As an institution, dating back to 1901 (nearly 120 years and counting), as there is no public information that is accessible as it relates to the employment of minorities, and in particular, of African-Americans on the bureau. The disclosure of this information would have served the Plaintiff, a social scientist by training, in getting a better picture of the bureau's history. More, such information would have been exculpatory to the Bureau and would dispel any lingering notions it maintained a segregated workplace. As of this filing, the Plaintiff still has no knowledge as to whether or not the Bureau has ever employed an African-American or the representation of other minority groups serving in a legal or legislative analyst role.

57. The Plaintiff never received a response from the Chief of the LRB, Mr. Richard Champagne nor from Legislative Librarian Patrica Reichert **[Exhibit 6]**. The request was made in a public capacity and prior to the filing of any legal actions. The LRB was required to acknowledge the request for this information and to provide a response, even if that response was inconclusive. Rather, Mr. Champagne and Ms. Reichert, likely at the direction of Champagne, Hanaman or others, refused to acknowledge or respond to the Plaintiffs requests for public information.

58. Title 29 § C.F.R 1600 et seq., requires the EEOC to notify respondents (the Defendants) of the filing of a charge. During this timeframe, Mr. Champagne had been made aware of the Plaintiff's civil rights charge. Mr. Champagne had directed Ms. Hanaman to draft a statement refuting that charge. That statement was later provided by Attorney Anne Bensky in the LRB's position statement to the EEOC **[Exhibit 3]**.

59. The filing of an EEOC charge is a constitutionally protected activity. Aggrieved individuals that seek the assistance of the EEOC, DOJ or other Civil Rights agencies, should not live in fear that their actions will expose them to harm or mistreatment at the hands of state officials.

60. The U.S Constitution further prohibits that no state shall "deny to any person within its jurisdiction the equal protection of the laws," (14th Amendment). At its crux, this is essentially a direction that all persons similarly situated should be treated alike. The LRB did not treat the Plaintiff in a similar fashion as others. The reason being that the Plaintiff exercised his constitutional rights and was subsequently targeted for mistreatment.

## 5. DISCRIMINATION, DISPARATE TREATMENT & IMPACT

61. It is the policy of the State of Wisconsin, "to provide for equal employment opportunity by ensuring that all personnel actions including hire, tenure or term, and condition[s] or privilege of employment be based on the ability to perform the duties and responsibilities assigned to the particular position without regard to age, race, creed or religion, color, disability, sex, national origin, ancestry, sexual orientation, or political affiliation" (230.01(b)).

62. In the process of filling the role for the Legislative Reference Analyst, the LRB deviated from state policy, prevailing standards for HR practices and used impermissible considerations as a condition for employment. Further, the criteria developed to assess applicants varied, conflicted and contained no safeguards to prevent bias. Once applied, the criteria evaluated applicants differently, depending on any affiliations that they may have had with sitting members of the panel. Those considerations included protected characteristics that were known to panel members and influenced the decisions made in regards to whom to interview and subsequently employ [**Exhibit 7**], [**Exhibit 8**], [**Exhibit 9**].

63. Due to the nature of closed social networks, the Plaintiff is unable to meet the impermissible criteria of antecedent affiliation used during the hiring process. More, the use of social networks presents a particularly insurmountable challenge for those outside such social circles, and in particular, African-Americans and other minority groups [**Exhibit 7**], [**Exhibit 8**].

64. As a result of these practices, the Plaintiff and others with similarly shared characteristics have been adversely impacted by the actions described herein.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF
## CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS (42 U.S.C §§1985(3))

65. Plaintiff incorporates the preceding paragraphs as alleged above.

66. The Defendants conspired to suppress the exercise of the Plaintiff's constitutional rights by denying him access to information which he was legally entitled to acquire; and for the sole purpose of hiding incriminating information and defeating any civil rights charged against it.

67. The conduct of the Defendants caused undue hardship for the Plaintiff and forced him to go through other unnecessary channels (i.e, Office of the Attorney

General, EEOC, DOJ et al.,) to obtain information that was meant to be in the public domain.

68. The foregoing conduct delayed and interfered with the exercise of the Plaintiff's constitutional rights and is illegal under 42 U.S.C §§ 1985 *et seq*.

69. Plaintiff requests relief as hereinafter described.

## SECOND CLAIM FOR RELIEF
## EQUAL PROTECTIONS VIOLATION (42 U.S.C §§1983)

70. Plaintiff incorporates the preceding paragraphs as alleged above.

71. The Defendants had a duty under state law to provide informational services to the public, in a fair and impartial manner. The Defendants, on learning of the Plaintiff's charge, sought to punish him by refusing to render these services, whilst, others similarly situated were treated in a preferential manner.

72. The conduct of the Defendants has deprived the Plaintiff of his constitutional right to equal protection which is prohibited under the 14th amendment of the U.S Constitution.

73. Plaintiff requests relief as hereinafter described.

## THIRD CLAIM FOR RELIEF
## DISCRIMINATION (42 U.S.C. §§ 2000 et seq.)

74. Plaintiff incorporates the preceding paragraphs as alleged above.

75. The Defendant takes into consideration protected characteristics during the hiring process which has had an adverse impact on the Plaintiff. The conduct of the Defendant has had the effect of depriving the Plaintiff of a fair and impartial process to obtain employment.

76. The foregoing conduct constitute illegal discrimination prohibited by 42 U.S.C. §§ 2000 *et seq*.

77. Plaintiff requests relief as hereinafter described.

## FOURTH CLAIM FOR RELIEF
## DISPARATE TREATMENT (42 U.S.C. §§ 2000 et seq.)

78. Plaintiff incorporates the preceding paragraphs as alleged above.

79. The Defendant's policies treated the Plaintiff differently during the recruitment process because of his membership in a protected class, whilst those outside this protected class received preferential treatment.

80. The conduct of the Defendant has had the effect of depriving the Plaintiff of a fair and impartial process to obtain employment.

81. The foregoing conduct constitutes illegal discrimination prohibited by 42 U.S.C. §§ 2000 *et seq*.

82. Plaintiff requests relief as hereinafter described

## FIFTH CLAIM FOR RELIEF
## DISPARATE IMPACT (42 U.S.C. §§ 2000 et seq.)

83. Plaintiff incorporates the preceding paragraphs as alleged above.

84. The Defendant deviated from official state policy, employed a flawed, non-valid, inconsistent and questionable method that is far removed from prevailing HR practices for recruitment. This practice has had the effect of burdening minorities, especially African-Americans, with the insurmountable goal of obtaining acceptance to closed social networks in order to be considered for employment. More, the overall effect of these policies makes it virtually impossible for the Plaintiff or

others similarly situated to ever gain employment with the Defendant.

85. The Defendant has utilized hiring practices that have caused a disparate impact on the basis of race and national origin. These practices include, but are not limited to, hiring based on subjective decision-making.

86. The foregoing conduct of the Defendant has had the effect of depriving the Plaintiff and others similarly situated of a fair and impartial process to obtain employment and constitutes illegal discrimination prohibited by the Civil Rights Act of 1964, and as thereafter amended.

87. Plaintiff requests relief as hereinafter described

## **PRAYER FOR RELIEF**

88. WHEREFORE, Plaintiff prays for relief as follows:

1. A declaratory judgment that the practices complained of herein are unlawful and violate 42 U.S.C. §§ 2000e, et seq.; 42 U.S.C §§ 1981; 1983; 1985 and the Equal Protections Clause;

2. An injunction against the Defendant that prohibits them from engaging in policies, patterns, and/or practices described in this complaint;

3. An order that the Defendant institute and carry out policies, practices, and programs that provide equal employment opportunities for all, regardless of profile, background or abilities; and that it eradicate the effects of their past and present unlawful employment practices;

4. An order requiring the Defendant to employ an EEO consultant to audit practices and to prevent recidivism to old exclusionary policies and practices;

5. Exemplary and punitive damages in an amount commensurate with the Defendant's ability to pay and to deter future conduct;

6. Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

7. Pre-judgment and post-judgment interest, as provided by law; and such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## JURY DEMAND

89. Plaintiff demands a trial by jury in this action.

*Respectfully submitted,*

/s/ Emir Dini
P.O BOX 247831
COLUMBUS, OH 43224

